UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
DISH NETWORK L.L.C., :
              Plaintiff, :
               :
v. : **OPINION AND ORDER**
               :
IMTIYAZ SIDDIQI, individually and d/b/a : 18 CV 4397 (VB)
Global Telecommunications and Global :
Communications, :
              Defendant. :
--------------------------------------------------------------x

Briccetti, J.:

    Plaintiff Dish Network L.L.C. brings this action against defendant Imtiyaz Siddiqi, individually and doing business as Global Telecommunications and Global Communications, for violations of the Lanham Act, as well as for unfair competition and tortious interference with an existing contractual relationship and prospective business relations under state law.

    Now pending is plaintiff's unopposed motion for partial summary judgment on its contributory trademark infringement and vicarious trademark infringement claims only. (Doc. #37).

    For the following reasons, the motion is GRANTED.

    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

    Plaintiff has submitted a memorandum of law, statement of material facts pursuant to Local Civil Rule 56.1, declarations, and supporting exhibits. Together, they reflect the following uncontested factual background.[1]

---

[1]     Despite being represented by counsel, defendant never filed opposition to the motion.

I.  Plaintiff's Trademarks

Plaintiff, a pay-television provider, operates a direct broadcast satellite system and delivers programming to millions of subscribers nationwide. It conducts business using the trademarks DISH and DISH NETWORK. Moreover, it owns three federally registered word marks for DISH and DISH NETWORK (collectively, the "DISH marks").[2] For more than twenty years, plaintiff has used the DISH marks to conduct business with customers and vendors.

II.  The Upgrade Scheme

Beginning in early 2016, hundreds of plaintiff's subscribers located throughout the United States were contacted by telephone by persons (the "callers") who, using one or both of the DISH marks, identified themselves as representatives of plaintiff. The subscribers' caller IDs identified the calls as coming from DISH, DISH NETWORK, or from plaintiff's toll-free telephone number.

The callers informed plaintiff's subscribers that their broadcast-receiving equipment needed to be upgraded to maintain DISH service and programming. The callers instructed plaintiff's subscribers to pay for the upgrades either by (i) credit card over the telephone, or (ii) check or money order made payable to Global Communications or Global Business Company and deliverable to P.O. Box 1509, Yonkers, NY, or 294 First Street, Yonkers, NY. The callers, using the DISH marks, identified Global Communications and Global Business Company as plaintiff's affiliates.

---

[2]  The record includes three trademark registrations: (i) a U.S. trademark registration certificate for "DISH," bearing Registration No. 3440594; (ii) a second U.S. trademark registration certificate for "DISH," bearing Registration No. 4206082; and (iii) a U.S. trademark registration certificate for "DISH NETWORK," bearing Registration No. 3264300. (See Doc. #40-1 Exs. 1–3).

In reality, the callers were located in Pakistan and not associated with plaintiff, and were not authorized to conduct business on plaintiff's behalf or authorized to use the DISH marks. In other words, the callers were masquerading as plaintiff's agents.

III.     Defendant's Role in the Upgrade Scheme

The callers did not process any payments from plaintiff's hoodwinked subscribers. This task was left to defendant. Indeed, Global Communications and Global Business Company were businesses established and operated by defendant. The Yonkers addresses to which the callers told plaintiff's subscribers to mail payments—P.O. Box 1509 and 294 First Street—both belong to defendant. The former is his rented mail box; the latter, his home. Thus, defendant authorized the callers to use his business and address information.

The callers notified defendant of payments he should expect to receive by mail, and defendant returned the favor by notifying the callers once payments were received. Defendant deposited received checks and money orders into several bank accounts under his control. The checks and money orders (i) were made payable to DISH or DISH NETWORK, or (ii) listed defendant's business names in conjunction with DISH or DISH NETWORK. Defendant also deposited checks and money orders referencing DISH or DISH NETWORK in the memo/for fields of the instruments.

When individuals elected to pay for the sham upgrades by credit card, the callers passed along the cardholder information to defendant. Defendant then processed the credit card payments using merchant accounts under his control.

At first, defendant processed these credit card payments using his Global Communications merchant account. A high percentage of the processed payments resulted in chargebacks—i.e., payment reversals—because of complaints for reasons including fraud. The

account issuer informed defendant of these complaints. Further, the account issuer placed defendant's name on its "terminated merchant" list and closed defendant's Global Communications merchant account because of the high number of chargebacks and complaints of fraud.

Thereafter, defendant opened a merchant account using his wife's name. Defendant registered this account to Global Business Company. Defendant used the Global Business Company account to continue processing credit card payments procured by the callers.

Defendant and the callers agreed to share the proceeds of the upgrade scheme. Defendant pocketed twenty percent of the payments; the callers pocketed eighty percent. After payments posted to defendant's account, he utilized money transfer services Moneygram and Aayan to remit to the callers their agreed-upon share of the proceeds.

Defendant continued to process mail and credit card payments for the callers after he was served with the complaint, and even after the parties' first appearance in this case.

Between January 11, 2016, and August 23, 2018, defendant deposited at least $238,747 in check and money orders into his bank accounts. More than 55 percent of these payments—$132,429—were from plaintiff's subscribers as payments attributable to the fraudulent upgrade scheme.

During this same time, defendant processed at least $185,793.26 in credit card payments using his two Global merchant accounts. Defendant has not produced records identifying the cardholders whose credit cards were charged for the hoax upgrades.

# DISCUSSION

I. <u>Standard of Review</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).[3]

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." <u>Wilson v. Nw. Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. <u>Zalaski v. City of Bridgeport Police Dep't</u>, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 322–23. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." <u>Brown v. Eli Lilly & Co.</u>, 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

5

evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

"Where, as here, a party has not opposed a motion for summary judgment, the district 'court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed.'" Slep-Tone Entm't Corp. v. Golf 600 Inc., 193 F. Supp. 3d 292, 295 (S.D.N.Y. 2016) (quoting Jackson v. Fed. Express, 766 F.3d 189, 194 (2d Cir. 2014)). Indeed, if a party has not opposed the motion, the Court may grant summary judgment only "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

In deciding a motion for summary judgment, the Court need consider only evidence that would be admissible at trial. Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II. <u>Direct Trademark Infringement</u>

Plaintiff brings two secondary trademark infringement claims against defendant: (i) contributory trademark infringement, and (ii) vicarious trademark infringement. As a preliminary matter, therefore, the Court first must find a direct infringing use of the DISH marks before it may consider whether defendant is liable under either theory of secondary liability.

The Court so finds.

"To prevail on a claim of trademark infringement, a plaintiff must show, first, that its mark merits protection, and second, that [another's] use of a similar mark is likely to cause consumer confusion." <u>Brennan's, Inc. v. Brennan's Rest., L.L.C.</u>, 360 F.3d 125, 129 (2d Cir. 2004).

As for the first prong, registered trademarks are presumed to confer to the owner protection and exclusive rights of use in commerce. See <u>Patsy's Italian Rest., Inc. v. Banas</u>, 658 F.3d 254, 266 (2d Cir. 2011) (citing 15 U.S.C. § 1115(a)).

As for the second prong, the Court traditionally considers the non-mechanical and non-exclusive list of factors set forth in <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492 (2d Cir. 1961), to determine whether a likelihood of consumer confusion exists. The eight <u>Polaroid</u> factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

<u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 115 (2d Cir. 2009) (citation omitted).

7

However, use of a counterfeit mark, or "the exact same mark," is inherently confusing to a customer. Can't Live Without It, LLC v. ETS Express, Inc., 287 F. Supp. 3d 400, 417 (S.D.N.Y. 2018). "Counterfeit" is defined as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. Thus, "it is not necessary to perform the step-by-step examination of each Polaroid factor" when a counterfeit mark is at issue. Can't Live Without It, LLC v. ETS Express, Inc., 287 F. Supp. 3d at 417.

Here, plaintiff owns federally registered and valid word marks for the DISH marks. (Doc. #40-1 Exs. 1–3). These trademark registrations are prima-facie evidence of the validity of the DISH marks and plaintiff's exclusive right to use the DISH marks in commerce. Accordingly, plaintiff's registered and valid word marks establish the first element of direct trademark infringement.

The second element is also satisfied, as the callers used counterfeit marks, which are inherently confusing. See Can't Live Without It, LLC v. ETS Express, Inc., 287 F. Supp. 3d at 417. Indeed, DISH, DISH NETWORK, or plaintiff's telephone number appeared on plaintiff's subscribers' caller ID when the callers made contact.

Even so, when considering the Polaroid factors, the risk of customer confusion is readily apparent. The callers intended for plaintiff's subscribers to perceive incoming calls to be from plaintiff. In other words, confusing plaintiff's customers was precisely the callers' goal.

Accordingly, based on the undisputed record, the Court finds direct trademark infringement of the DISH marks as a matter of law.

III.  Contributory Trademark Infringement Claim

Plaintiff argues it is entitled to summary judgment on its contributory trademark infringement claim against defendant.[4]

The Court agrees.

A.  Legal Standard

Contributory trademark infringement "derives from the common law of torts" for "culpably facilitating the infringing conduct of . . . counterfeiting vendors." Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 103 (2d Cir. 2010).

The Supreme Court explained in Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 854 (1982), that "the core of this doctrine is that a manufacturer or distributor infringes when it 'intentionally induces another to infringe a trademark,' or 'continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement.'" Slep-Tone Entm't Corp. v. Golf 600 Inc., 193 F. Supp. 3d at 296 (quoting Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d at 104).

Although "[t]he Second Circuit has left open the Inwood test's applicability outside the context of manufacturers and distributors," other courts, including at least one in this district, have extended the application of contributory trademark infringement to service providers. Slep-Tone Entm't Corp. v. Golf 600 Inc., 193 F. Supp. 3d at 296 (citing Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d at 104). "[I]ncluded within the definition of service providers [is] a 'venue[] that provides a service,' such as a forum through which infringement occurs." Id. (quoting Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 463, 505–06 (S.D.N.Y. 2008), rev'd on other grounds, 600 F.3d at 144).

---

[4]  This claim is Count III in the amended complaint.

In the services context, contributory trademark infringement "requires that the service provider . . . have more than a general knowledge or reason to know that its service is being used [for an infringing purpose]. Some contemporary knowledge of [the particular infringement] is necessary." Slep-Tone Entm't Corp. v. Golf 600 Inc., 193 F. Supp. 3d at 297 (quoting Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d at 107). Thus, if a service provider continues to supply its service to a party that it knows, or has reason to know, is engaging in trademark infringement, then liability for contributory trademark infringement will attach. Id. (citing Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d at 106).

A party with "sufficient control over the instrumentality used to infringe" may not "willfully shut its eyes to the infringing conduct" of a third party. Gucci Am., Inc. v. Frontline Processing Corp., 721 F. Supp. 2d 228, 249 (S.D.N.Y. 2010). Indeed, "willful blindness is equivalent to actual knowledge for purposes of the Lanham Act." Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d at 109.

B.     Analysis

The undisputed record evidence demonstrates defendant's liability for contributory trademark infringement as a matter of law.

The first element of contributory trademark infringement is satisfied, as defendant provided payment processing services to the callers. Indeed, the scheme was only half-complete once plaintiff's subscribers were scammed by the callers. The second, critical part of the operation was remuneration.

To that end, defendant provided payment processing services through which the callers' direct trademark infringement was actualized. Defendant and the callers exchanged hundreds of

calls per month to manage the scheme, and defendant, using his bank and merchant accounts, processed hundreds of fraudulent payments procured by the callers.

The second requirement of contributory trademark infringement is also satisfied, as defendant either knew, or had reason to know, of the DISH marks infringement, and yet continued to process payments for the callers. First, defendant accepted and deposited hundreds of payments by mail or money order that referenced either (i) DISH or DISH NETWORK in the payee line, or (ii) DISH, DISH NETWORK, or DISH products and services in the memo/for fields of the payments.

Second, scores of credit card payments defendant processed using his merchant accounts were reversed for reasons including fraud. Defendant was aware of these chargebacks before, and certainly after, the account issuer closed his Global Communications merchant account and placed his name on its terminated merchant list. Undeterred by these obstacles, defendant opened a second merchant account—Global Business Company—in his wife's name, to avoid detection and restore payment processing services to the callers.

Third, defendant continued to process payments from plaintiff's subscribers after he was served with the complaint in this case, and even after the parties' initial appearance before the Court in this matter.

For these reasons, defendant either knew, had reason to know, or was willfully blind to the fact that the callers were infringing plaintiff's DISH marks, and yet continued to provide payment processing services for an infringing purpose. Accordingly, plaintiff is entitled to summary judgment on its contributory trademark infringement claim.

IV.  Vicarious Trademark Infringement Claim

Next, plaintiff contends it is entitled to summary judgment on its vicarious trademark infringement claim against defendant.[5]

The Court agrees.

A.  Legal Standard

Vicarious liability in the federal trademark context is essentially the same as in the tort context: liability of one party based on its relationship with an infringing third party. Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 173 (S.D.N.Y. 1998).

Mere knowledge of the primary actor's wrongful conduct does not establish liability for vicarious trademark infringement. TRB Acquisitions LLC v. Seduka, LLC, 2016 WL 2865098, at *3 (S.D.N.Y. 2016). Rather, this secondary theory of liability "requires a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." Kelly-Brown v. Winfrey, 717 F.3d 295, 314 (2d Cir. 2013).

"[O]ne need not show a fiduciary relationship [between the defendant and third party] to establish that an agency relationship exists; rather, fiduciary duties arise as a result of circumstances establishing the agency relationship." 87 C.J.S. Trademark § 294 (2019) (citing 1-800 Contacts, Inc. v. Lens.com, 722 F3d 1229, 1250 (10th Cir. 2013)).

B.  Analysis

The undisputed record evidence demonstrates defendant's liability for vicarious trademark infringement as a matter of law.

---

[5] This claim is Count IV in the amended complaint.

First, defendant and the callers agreed to conduct the upgrade scheme that infringed plaintiff's exclusive right to use the DISH marks in commerce. The callers were authorized to use defendant's Global business names, his rented P.O. Box, and his home address, to convince plaintiff's subscribers to pay for the upgrade con. Defendant and the callers further agreed to split plaintiff's subscribers' payments, and the callers relied on defendant to pay them their share of the bounty. Accordingly, defendant and the callers partnered to facilitate the infringement.

Second, defendant and the callers each exercised control over the scheme. The success of the upgrade ploy depended on both the callers' direct infringement of the DISH marks and defendant's payment processing services. The callers notified defendant of expected payments, and defendant notified the callers when he received them. The callers were responsible for initiating the payments, and defendant was responsible for processing the payments. Each of these components was integral to the operation. Moreover, defendant maintained a fiduciary duty to transmit to the callers their agreed-upon share of the payments. For these reasons, defendant participated in, and shared control over, the scheme to use the DISH marks to turn a profit.

Accordingly, defendant is liable for vicarious trademark infringement.

V.  Permanent Injunction

Plaintiff further argues it is entitled to a permanent injunction against defendant to protect its trademarks.

The Court agrees.

To obtain a permanent injunction, plaintiff must establish "(1) actual success on the merits and (2) irreparable harm." Coach, Inc. v. Horizon Trading USA Inc., 908 F. Supp. 2d 426, 439 (S.D.N.Y. 2012); see also N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d

286, 294 (2d Cir. 2012). In a trademark infringement case, a party need not first seek a preliminary injunction to demonstrate an entitlement to permanent injunctive relief. <u>Louis Vuitton Malletier S.A. v. LY USA, Inc.</u>, 676 F.3d 83, 104 n.20 (2d Cir. 2012).

When liability in a trademark case is established, the Court considers four factors in determining whether injunctive relief shall issue: "(1) the likelihood that the plaintiff will suffer irreparable harm in the absence of an injunction, (2) whether remedies at law (such as monetary damages) are adequate to compensate the plaintiff for that harm, (3) whether the balance of hardships tips in the plaintiff's favor, and (4) whether the public interest would be served by the issuance of an injunction." <u>Coty Inc. v. Excell Brands, LLC</u>, 277 F. Supp. 3d 425, 463 (S.D.N.Y. 2017) (citing <u>Salinger v. Colting</u>, 607 F.3d 68, 80 (2d Cir. 2010)).

For the reasons set forth above, plaintiff has demonstrated success on the merits, "and in this Circuit, 'a showing of likelihood of confusion establishes irreparable harm.'" <u>Gucci Am., Inc. v. Duty Free Apparel, Ltd.</u>, 286 F. Supp. 2d 284, 290 (S.D.N.Y. 2003) (quoting <u>Genesee Brewing Co. v. Stroh Brewing Co.</u>, 124 F.3d 137, 142 (2d Cir. 1997)). Monetary or other damages are inadequate to prevent this harm; constant threats to plaintiff, and its current and prospective customers, will remain if defendant's conduct endures. The balance of hardships tips in plaintiff's favor, and enjoining defendant from further involvement in an unlawful telemarketing scam serves the public interest.

Accordingly, plaintiff is entitled to a permanent injunction against defendant.

VI.  <u>Damages</u>

Plaintiff further requests the Court award $300,000 in statutory damages because of defendant's willful trademark infringement.

The Court finds this request appropriate.

In a trademark infringement case, a plaintiff may elect to receive statutory damages in lieu of actual damages. Spin Master Ltd. v. Alan Yuan's Store, 325 F. Supp. 3d 413, 424 (S.D.N.Y. 2018). In a case involving the use of a counterfeit mark, the Lanham Act allows recovery of statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark . . . as the court considers just," with an increased limit of $2,000,000 per mark if the infringement was "willful." 15 U.S.C. § 1117(c).

"To prove willfulness, a plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness." Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc., 507 F. App'x 26, 31 (2d Cir. 2013) (summary order). "If the evidence establishes that no reasonable juror could fail to find other than willful infringement, the court may award enhanced statutory damages for willful infringement at the summary judgment stage." Innovation Ventures, LLC v. Ultimate One Distrib. Corp., 176 F. Supp. 3d 137, 165 (E.D.N.Y. 2016).

The Lanham Act, however, does not provide guidance on the appropriate award of statutory damages. Rather, courts in this Circuit consider the following factors to calculate an appropriate award:

> (1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

Innovation Ventures, LLC v. Ultimate One Distrib. Corp., 176 F. Supp. 3d at 165 (citing Fitzgerald Publ'g Co. v. Baylor Publ'g Co., 807 F.2d 1110, 1116–17 (2d Cir. 1986)).

Finally, defendant bears the burden to prove that any of his earnings is not related to the infringement. George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1539 (2d Cir. 1992).

Here, for the reasons set forth above, defendant's conduct was willful. Defendant was aware of the infringement of the DISH marks, or, at the very least, willfully blind to it.

Further, $300,000 is an appropriate award given the facts and circumstances of this case. About 55 percent of the $238,747 defendant deposited in his bank accounts during all times relevant to the complaint, or $132,429, came from check and money order payments from plaintiff's subscribers. As regards processed credit card transactions, defendant has not met his burden to demonstrate that any of these earnings, $185,793.26, is not related to the infringement of the DISH marks.

In consideration of the above, a statutory damages award of $300,000 is both reasonable and just. This is especially so in light of the $6 million maximum authorized by the Lanham Act for defendant's willful blindness to the infringement of the three DISH marks.

Accordingly, the Court awards plaintiff $300,000 in statutory damages against defendant.

VII.   Reasonable Attorneys' Fees and Costs

Lastly, plaintiff argues the Court should award costs and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

The Court agrees.

In "exceptional cases," a court may award attorney's fees to the prevailing party under the Lanham Act. 15 U.S.C. § 1117(a). Recently, the Supreme Court considered the meaning of "exceptional cases" under the attorney's fees provision of the Patent Act, a provision identical to the one found in Section 1117(a) of the Lanham Act. See Octane Fitness, LLC v. ICON Health

& Fitness, Inc., 572 U.S. 545, 554 (2014). The Second Circuit has concluded Octane's "exceptional cases" analysis applies to Section 1117(a) of the Lanham Act. Sleepy's LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 531 (2d Cir. 2018).

In Octane, the Court concluded that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.'" Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. at 554.

The Court continued:

> District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances. As in the comparable context of the Copyright Act, "'[t]here is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.'"

Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. at 554 (quoting Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 (1994)). Those considerations comprise, inter alia, "a 'nonexclusive' list of 'factors,' including frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Id. (quoting Fogerty v. Fantasy Inc., 510 U.S. at 534 n.19).

This is an exceptional case which, in an exercise of the Court's discretion, warrants the imposition of a reasonable attorney's fee. Defendant processed payments for the callers, who directly infringed plaintiff's exclusive right to use of the DISH marks in commerce. Defendant continued to do so either knowing, or with reason to know, that his and the callers' conduct was unlawful. Further, defendant took measures to maintain processing services for the callers even after one of his accounts was closed by the account issuer and his name placed on a terminated

17

merchants list. Finally, defendant continued to process these payments even after he was served with the complaint in this matter, and again after the parties' initial conference before the Court.

Accordingly, the Court grants plaintiff's motion for an award of costs and a reasonable attorney's fee pursuant to Section 1117(a).

## CONCLUSION

The motion for partial summary judgment and for an award of costs and attorneys' fees is GRANTED.

Defendant is permanently enjoined from selling, offering for sale, or accepting payment for any product or service infringing on any of plaintiff's DISH marks.

By November 20, 2019, plaintiff shall submit documentation of its costs and attorneys' fees incurred in this case, and a concise explanation of why the requested fees are reasonable. By December 4, 2019, defendant may file an opposition to plaintiff's fee application.

Also by November 20, 2019, plaintiff's counsel shall advise the Court by letter how plaintiff wishes to proceed, if at all, on its remaining claims (Counts I, II, V, VI, and VII of the amended complaint).

The Clerk is instructed to terminate the motion. (Doc. #37).

Dated: November 6, 2019
      White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge